## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| KETONATURAL PET FOODS, INC.,<br>individually and on behalf of all others<br>similarly situated,<br><br>                              Plaintiff,<br><br>v.<br><br>HILL'S PET NUTRITION, INC., a subsidiary<br>of Colgate-Palmolive Co.,<br>                              Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

CIVIL ACTION

No. 24-2046-KHV

---

## MEMORANDUM AND ORDER

On February 6, 2024, plaintiff, individually and on behalf of all others similarly situated, filed a class action complaint against Hill's Pet Nutrition, Inc., Morris Animal Foundation, Mark Morris Institute, Inc., Lisa M. Freeman, John E. Rush, Darcy B. Adin, Joshua A. Stern and Ryan C. Fries. See Class Action Complaint For Lanham Act Violations And Civil Conspiracy (Doc. #1). Plaintiff has voluntarily dismissed its claims against all defendants except Hill's Pet Nutrition, Inc.[1] Plaintiff asserts that on account of its own actions and those of the dismissed defendants, Hill's Pet Nutrition is liable for false representations in violation of the Lanham Act, 15 U.S.C. § 1051 et seq. (Count I) and civil conspiracy in violation of Kansas law (Count II). See Complaint (Doc. #1). This matter is before the Court on Defendant Hill's Pet Nutrition, Inc.'s Motion To Dismiss Complaint (Doc. #82) filed June 17, 2024. For reasons stated below, the Court sustains

---

[1]       See Notice Of Voluntary Dismissal (Doc. #66) filed June 6, 2014 (Lisa M. Freeman and John E. Rush); Notice Of Voluntary Dismissal Of Joshua A. Stern (Doc. #75) filed June 14, 2024; Notice Of Voluntary Dismissal Of Darcy B. Adin (Doc. #76) filed June 14, 2024; Notice Of Voluntary Dismissal Of Ryan C. Fries (Doc. #81) filed June 17, 2024; Notice Of Voluntary Dismissal Of Morris Animal Foundation (Doc. #89) filed July 12, 2024; Notice Of Voluntary Dismissal Of Mark Morris Institute (Doc. #91) filed July 17, 2024.

defendant's motion.

## Legal Standard

In ruling on a motion to dismiss for failure to state a claim under Rule 12(b)(6), Fed. R. Civ. P., the Court assumes as true all well-pleaded factual allegations and determines whether they plausibly give rise to an entitlement to relief. Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009). To survive a motion to dismiss, a complaint must contain sufficient factual matter to state a claim which is plausible—and not merely conceivable—on its face. Id. at 679–80; Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). In determining whether a complaint states a plausible claim for relief, the Court draws on its judicial experience and common sense. Iqbal, 556 U.S. at 679.

The Court need not accept as true those allegations which state only legal conclusions. See id. Plaintiff bears the burden of framing its claims with enough factual matter to suggest that it is entitled to relief; it is not enough to make threadbare recitals of a cause of action accompanied by conclusory statements. See Twombly, 550 U.S. at 556. Plaintiff makes a facially plausible claim by pleading factual content from which the Court can reasonably infer that defendant is liable for the alleged misconduct. Iqbal, 556 U.S. at 678. Plaintiff must show more than a sheer possibility that defendant has acted unlawfully—it is not enough to plead facts that are "merely consistent" with defendant's liability. Id. (quoting Twombly, 550 U.S. at 557). A pleading which offers labels and conclusions, a formulaic recitation of the elements of a cause of action or naked assertions devoid of further factual enhancement will not stand. Id. Similarly, where the well-pleaded facts do not permit the Court to infer more than mere possibility of misconduct, the pleading has alleged—but has not "shown"—that the pleader is entitled to relief. Id. at 679. The degree of specificity necessary to establish plausibility and fair notice depends on context, because what constitutes fair notice under Rule 8(a)(2), Fed. R. Civ. P., depends on the type of case. Robbins v.

Oklahoma, 519 F.3d 1242, 1248 (10th Cir. 2008).

In evaluating a motion to dismiss under Rule 12(b)(6), the Court can consider not only the complaint, but when no party disputes their authenticity, documents incorporated by reference in the complaint and documents referred to in and central to the complaint. Clinton v. Sec. Benefit Life Ins. Co., 63 F.4th 1264, 1275 (10th Cir. 2023).

**Factual Background**

Plaintiff's complaint alleges as follows:

Plaintiff is a start-up corporation that manufactures and sells grain-free pet food, pet treats and supplement products. Defendant is one of the largest and oldest pet food companies, with annual revenues exceeding $2 billion. Like plaintiff, defendant manufactures and sells pet food, pet treats and supplement products, but defendant's products contain grain as an ingredient. Only three pet food companies in the United States—defendant, Nestle-Purina PetCare and Mars Petcare—sell "traditional" grain-containing products.

I.    **Defendant's Marketing Strategy**

Defendant is a subsidiary of a multi-national consumer products firm, Colgate-Palmolive Company. When Colgate acquired defendant in 1976, it adopted a strategy that instead of marketing to end consumers, it would market to veterinarians, who in turn would promote products to clients. Initially, defendant achieved great success with this strategy, growing from $40 million in annual sales in 1982 to nearly $900 million by 1997. In the years that followed, defendant built its brand around marketing to veterinary professionals.[2]  As part of this distribution model, defendant offers free continuing education courses to veterinarians and their technicians, plus

---

[2]    Defendant distributes products to thousands of veterinary clinics around the country, and veterinarians can charge a markup on every bag of defendant's product sold through their clinics.

product literature and incentive programs.

Defendant funds research and other strategic priorities at veterinary schools and universities across the country.  Defendant's web site states that it funds "more than 50 research papers and textbook chapters each year."  <u>Complaint</u> (Doc. #1), ¶ 39.[3]  In addition to funding university projects, defendant provides significant funding to non-profit entities and influential professional organizations, such as the American Veterinary Medical Association.

Defendant has also created a number of "cut-outs," which are affiliated entities that appear to be independent non-profit organizations but are largely funded by defendant.  The Morris Animal Foundation ("MAF") and the Mark Morris Institute ("MMI") are two of defendant's cut-outs that fund veterinary research projects and institutions.  As of April of 2023, MAF had provided more than $149 million to fund approximately 3,000 veterinary studies.  MAF largely funds scientific studies, while MMI produces textbooks, continuing education courses and veterinary nutrition courses, complete with credentialed faculty, course materials and lectures.  Through the years, defendant's officers, directors and other agents have served on the boards of these two entities.

Defendant has partnered with multiple veterinarians in support of its marketing strategy.  Dr. Lisa Freeman is an influential veterinarian who writes and publishes extensively in both scholarly journals and consumer contexts.  Defendant has been providing financial support to Dr. Freeman since 1998.  Dr. Freeman is a veterinary professor at Tufts University and co-founder of the "Petfoodology" web site.  Defendant actively promotes the Petfoodology blog and encourages

---

[3]    Plaintiff's complaint references, quotes and links to various external sources, including web sites, announcements by the United States Food and Drug Administration and scholarly publications.  When applicable, the Court cites the specific paragraph of plaintiff's complaint rather than the external source.

veterinarians to send it to pet owners.  Petfoodology provides resources on pet nutrition.

Dr. Darcy Adin, another of defendant's research partners, worked at the veterinary school of North Carolina State University, which received $2,284,281 in research grants from MAF between 2015 and 2018.  Dr. Joshua Stern is a professor at UC Davis, which received $1,355,813 in funding from MAF between 2015 and 2022. Dr. Ryan Fries worked at the University of Illinois, which received $2,242,389 in funding from MAF between 2015 and 2022.  Individually and together, these veterinarians have authored various articles on pet nutrition.[4]

In 2014, because of rapid growth in the grain-free sector of the pet food industry, defendant's popularity with pet owners began to wane.  Between 2014 and 2017, defendant's market share fell by more than 20 per cent.  Facing flat sales, rapid erosion of its market share and a new competitive threat, defendant and individual veterinarians decided to conduct a coordinated campaign to raise concerns about the risks of grain-free pet foods.  Defendant described these foods as "BEG" diets: boutique, exotic or grain-free.  "Boutique" refers to the company size and "exotic" describes the ingredients used.  Exotic ingredients can include kangaroo, lentils, duck, pea, fava bean, buffalo, tapioca, salmon, lamb, barley, bison, venison and chickpeas.   This definition describes every pet food sold in America except for those made by defendant and two other companies.

II.    **The FDA Investigation**

On July 12, 2018, the United States Food and Drug Administration's ("FDA") Center for Veterinary Medicine publicly announced that it had begun an "investigation into [a] potential link

---

[4]    The Court collectively refers to Dr. Freeman, Dr. Rush, Dr. Adin, Dr. Stern and Dr. Fries as the "individual veterinarians."

between certain diets and canine dilated cardiomyopathy" ("DCM").[5] <u>Id.,</u> ¶ 112.  The FDA defined "certain diets" as those "containing peas, lentils, other legume seeds, or potatoes as main ingredients," which "appear to be more common in diets labeled as 'grain-free.'" <u>Id.,</u> ¶ 113–114.

According to the FDA, the investigation was prompted by a "recent spike in DCM cases" submitted through the FDA product safety reporting portal, an online system where consumers inform the FDA about products that they suspect have made their pets sick.  <u>Id.,</u> ¶ 112.  The FDA did not state how many cases were included in this spike.  Under the Freedom of Information Act, plaintiff's chief executive officer, Daniel Schulof, requested this information from the FDA.  In the FDA response, plaintiff discovered an email between the FDA and Dr. Adin, Dr. Freeman, Dr. Stern and Dr. Fries, setting up a meeting to discuss their "clinical observations and concerns concerning a potential relationship between grain-free canine diets and Dilated Cardiomyopathy." <u>Id.,</u> ¶ 117.

The FDA also produced an internal presentation which showed that since 2014, 80 per cent of the reported cases came from either Dr. Freeman or Dr. Adin.  FDA records showed that Dr. Freeman and Dr. Adin continued to submit DCM case reports after the FDA announced its investigation, and by 2019, they had collectively submitted at least 140 DCM case reports.  When submitting DCM case reports, Dr. Freeman and Dr. Adin did not send an unbiased, representative sample of the canine DCM cases that they encountered in their respective professional practices.

---

[5]    Canine dilated cardiomyopathy is a "disease of a dog's heart muscle and results in an enlarged heart. As the heart and its chambers become dilated, it becomes harder for the heart to pump, and heart valves may leak, which can lead to a buildup of fluids in the chest and abdomen (congestive heart failure)."  Questions & Answers: FDA's Work on Potential Causes of Non-Hereditary DCM in Dogs, available at <u>https://www.fda.gov/animal-veterinary/animal-health-literacy/questions-answers-fdas-work-potential-causes-non-hereditary-dcm-dogs</u> (last visited Oct. 22, 2024).

Rather, they cherry-picked cases involving grain-free diets while simultaneously withholding cases involving grain-containing diets. Initially, neither disclosed their selection protocol to the FDA.

Almost immediately after the FDA announced its DCM investigation, mainstream media began covering it, prominently featuring statements by Dr. Freeman, Dr. Adin and Dr. Stern. In their coverage, the New York Times, the Washington Post and NBC News all published statements by these veterinarians. Defendant also utilized the Petfoodology web site, publishing at least four articles about the DCM scandal, all authored by Dr. Freeman. Dr. Freeman's Petfoodology articles were not scientific studies and were not subject to any peer review process. MAF also posted on its web site about diets associated with DCM.

Because of the biased reporting, on June 12, 2018, the FDA issued a warning "alerting pet owners and veterinary professionals about reports of canine dilated cardiomyopathy (DCM) in dogs eating certain pet foods containing peas, lentils, other legume seeds, or potatoes as main ingredients," and stated that "[h]igh levels of legumes or potatoes appear to be more common in diets labeled as 'grain-free,' but it is not yet known how these ingredients are linked to cases of DCM." Id., ¶ 135. This alert "encourage[d] pet owners and veterinary professionals to report cases of DCM in dogs suspected of having a link to diet" to the FDA. Id. The FDA warning created panic among pet owners, resulting in a disproportionate number of new cases reported to the FDA on dogs fed grain-free diets when compared to dogs fed diets that contained grain.

On December 23, 2022, the FDA issued a press release which stated as follows:

FDA does not intend to release further public updates until there is meaningful new scientific information to share. A count of reports of DCM in dogs submitted to FDA as of November 1, 2022, has been added to Questions & Answers: FDA's Work on Potential Causes of Non-Hereditary DCM in Dogs. FDA has followed up on a subset of these reports, but is unable to investigate every report to verify or confirm the reported information. While adverse event numbers can be a potential

signal of an issue with an FDA regulated product, by themselves, they do not supply sufficient data to establish a causal relationship with reported product(s).

Id., ¶ 138.  After four and a half years, the FDA had not found a causal relationship between BEG diets and DCM.  Even so, the panic, media attention and misinformation surrounding the investigation caused massive financial and reputational harm to manufacturers of BEG pet food.

## III.    Defendant's Dissemination Of Misinformation

One of defendant's main methods of spreading misinformation surrounding BEG diets was through scholarly journals.  To date, the individual veterinarians have written at least 15 different journal articles which feature intentionally false or misleading statements about DCM.  Because of defendant's long-standing marketing strategy of reaching its consumers through veterinarians, these articles fanned the flames of hysteria among pet owners.

In the Journal of the American Veterinary Medical Association ("JAVMA"), December of 2018 edition (a few months after the FDA announced its investigation), Dr. Freeman, Dr. Adin, Dr. Stern, Dr. Rush and Dr. Fries co-authored an article titled, "Diet-Associated Dilated Cardiomyopathy in Dogs: What Do We Know?"  This article, which again asserted that grain-free diets contribute to dogs developing DCM, became the single most widely read article that the journal had ever published.  The article was not subject to peer review before publication.  In July of 2019, veterinarians, scientists, human medical providers, representatives of grain-free pet food companies and individual pet owners co-signed a retraction request which detailed the shortcomings of the article, but JAVMA did not retract it.

Dr. Stern also co-authored a study that after publication was the subject of an "Expression of Concern" written by the editors of the journal in which it was published.  The journal did not retract the article but provided a statement describing undisclosed financial conflicts (including defendant and MMI), methodology irregularity, faulty reasoning and other misconduct.

-8-

Even after five years of continuous work trying to prove the theory that BEG diets cause or exacerbate DCM, defendant has not identified any evidence supporting its assertions that (1) BEG diets are correlated with higher incidence rates of DCM than non-BEG diets; and (2) switching a dog from a BEG diet to a non-BEG diet is likely to improve DCM. The veterinarians have not published any study or article that (1) concludes that BEG diets are correlated with a worse clinical outcome for dogs or causes DCM, (2) discloses that Dr. Freeman and Dr. Adin's case reports led to the FDA to frame its investigation with a direct focus on grain-free diets or (3) discloses the extent of the funding relationships between the authors and their universities, and defendant, MAF and MMI. Without any evidence or disclosures, the veterinarians continued citing and repeating their assertions in academic writing, as well as linking the articles on defendant's web site. Defendant's web site also contained a section where veterinarians and their technicians could create an account, sign in and access additional information on pet nutrition. Through the veterinary and technician educational programs that defendant created, it continued offering courses that described the link between BEG diets and DCM.

Defendant also moderated, sponsored and controlled a private Facebook group on diet-associated DCM in dogs. The group contains more 129,000 members. The moderators have repeatedly blocked, banned and deleted comments by individuals who contradict the assertion that BEG diets are correlated with higher rates of canine DCM, even when the commenters are board-certified veterinary nutritionists, tenured professors at veterinary schools or others highly qualified in pet nutrition. The moderators of the Facebook page created a public-facing web site devoted entirely to amplifying their position that BEG diets are correlated with an increased risk of canine DCM. On the "How Can I Help" page of the web site, the moderators provided links to make

donations to five institutions, three of which are the universities where Dr. Stern, Dr. Freeman and Dr. Adin work. According to the web site, in 2019, at least five of the site's administrators attended a symposium on nutritionally-mediated DCM at defendant's headquarters in Topeka, Kansas.

Plaintiff alleges that defendant, MMI, MAF and the veterinarians made the following non-exhaustive list of false or misleading statements:[6]

- "[G]rain-free dog foods may be linked to heart disease." Id., ¶ 151.

- "[G]rain-free, exotic dog food [was] linked to heart disease." Id.

- "[H]eart problems [are] linked to grain-free food." Id.

- "[A] recent increase in heart disease in dogs eating certain types of diets [i.e., "BEG" diets] may shed light on the role of diet in causing heart disease." Id., ¶ 154.

- "Recently, some veterinary cardiologists have been reporting increased rates of DCM in dogs." Id.

- "There is suspicion that the disease is associated with eating boutique or grain-free diets, with some of the dogs improving when their diets are changed." Id.

- "The [FDA] and veterinary cardiologists are currently investigating this issue." Id.

- "Most of these affected dogs were eating boutique, grain-free, or exotic ingredient diets." Id.

- "What seems to be consistent is that it [DCM] does appear to be more likely to occur in dogs eating boutique, grain-free, or exotic-ingredient diets." Id.

- "It's Not Just Grain-Free." Id.

- "This does not appear to be just an issue with grain-free diets." Id.

- "The apparent link between BEG diets and DCM may be…" Id.

---

[6]    The complaint has also linked various articles, stating that the linked sources contain additional misrepresentations. The Court, however, will not undertake an independent scavenger hunt through these articles to identify potential misrepresentations. Accordingly, the Court focuses on statements quoted in plaintiff's complaint.

- "[W]e don't yet understand why BEG diets are affecting some dogs." <u>Id.</u>

- "In 2018, the [FDA] published an alert that they were investigating a potential connection between diet and DCM." <u>Id.</u>

- "[Diet-associated DCM] can improve significantly when the diet is changed." <u>Id.</u>

- "[M]ost owners I've worked with thought they were feeding their dog the best food possible, only to find out that the diet may have contributed to their dogs' heart disease." <u>Id.</u>

- "Associated diets – not just grain free." <u>Id.</u>

- "[I]t was identified early on that these dogs were eating diets with similar properties." <u>Id.</u>

- "Research has now shown that these diets . . . are commonly grain-free commercial dry diets that contain pulses[7] and, to a lesser extent, potatoes or sweet potatoes." <u>Id.</u>

- "Many have linked diet-associated DCM with grain-free diets. In fact, it appears to be more closely associated with diets containing pulses, rather than with the presence or absence of grains in a diet." <u>Id.</u>

- "Most dogs with diet-associated DCM have been eating non-traditional [BEG] diets for over one year." <u>Id.</u>

- "Dogs with less severe stages of the disease [DCM] have similar improvements in heart size and function after diet change." <u>Id.</u>

- "The FDA's data and the research evidence published thus far supports an association between non-traditional diets and DCM." <u>Id.</u>

- "Cardiologists continue to diagnose dogs with diet-associated DCM, especially in regions where non-traditional diets are common." <u>Id.</u>

- "Home-cooked diets have been implicated in this problem, as well as small batch, boutique dog foods." <u>Id.</u>, ¶ 157.

- "Over the past few years, an increasing number of DCM cases involving dogs appear to have been related to diet." <u>Id.</u>, ¶ 167.

---

[7]    "Pulses" are seeds of legumes.  <u>Complaint</u> (Doc. #1), ¶ 113.

- "[T]he apparent link between BEG diets and DCM may be due to the grain-free nature of these diets . . . possible nutritional imbalances, or inadvertent inclusion of toxic dietary components. Or, the apparent association may be spurious." Id.

- "The recent announcement from the US FDA alerting pet owners and veterinarians about reports of DCM in dogs eating pet foods containing peas, lentils, other legume seeds, or potatoes as main ingredients has raised concerns among the pet-owning public." Id.

- "DCM in some dogs without any apparent taurine deficiency appears to be reversible with a change in diet, with or without taurine supplementation." Id.

- "[R]ecovery of cardiac function has been observed in some dogs following a change in diet, with or without taurine supplementation." Id.

- "Veterinary cardiologists examining dogs with DCM were able to make an association with BEG diets because they were obtaining a diet history." Id.

- "Importantly, although there appears to be an association between DCM and feeding BEG, vegetarian, vegan, or home-prepared diets in dogs, a cause-and-effect relationship has not been proven." Id.

- "This study was initiated because of . . . an observation that many of these dogs were eating specialty meat-based grain-free (GF) diets." Id., ¶ 196.

- "Dogs with DCM or [sub-clinical abnormalities] previously eating [nontraditional diets] had small, yet significant improvements in echocardiographic parameters after diet changes." Id.

- "Since 2014, the United States Food and Drug Administration (FDA) has received reports of dilated cardiomyopathy (DCM) in pets with a potential link to certain diets. Many of the cases had been fed diets which were grain-free or contained pulses (e.g. peas, chickpeas and lentils), and to a lesser extent, potatoes. As of September 2020, more than 1100 dogs with DCM had been reported to the FDA." Id.

- "Investigations into a potential link between consumption of grain-free (GF), high-pulse diets, and the development of a dilated cardiomyopathy (DCM) phenotype in dogs have been ongoing since 2018." Id.

- "Metabolomic pathway differences between dogs eating GF versus GI diets highlight the important effect of diet in metabolomics analyses." Id.

- "There has been an increase in the number of DCM cases associated with

-12-

diet over the last several years, especially in atypical dog breeds." Id.

- "64%-95% of dogs with DCM in 4 recent studies were eating nontraditional diets, suggesting a possible association between DCM and nontraditional foods." Id.

- "These boutique diets tend to come from smaller manufacturers that may not have the nutritional expertise and resources to ensure quality control that the larger, established companies have . . . We are not yet seeing DCM in smaller dogs fed grain-free diets produced by large-scale manufacturers." Id., ¶ 203.

- "Diet-induced cardiomyopathy reported since 2017 in dogs fed 'premium' grain-free and boutique foods." Id., ¶ 206.

- "[A]sociated with some of these grain-free and nontraditional diets." Id.

- "By now, most veterinary professionals understand that there's a link between BEG diets and atypical dog breeds developing DCM." Id., ¶ 207.

- "[W]e only know what broad diet types have been associated with the disease: those that are high in pulse legumes, such as peas and lentils, those that are grain-free, those that are produced by small manufacturers with heavier focus on marketing than research." Id., ¶ 217.

- "What we know so far is that disease [DCM] is disproportionately associated with grain-free diets or diets high in pulse legumes, such as peas or lentils, particularly when made by manufacturers with a small market share. A small number of cases have been associated with boutique diets that fall outside of the grain-free, high-pulse pattern." Id.

- "The FDA's current investigation into diet and DCM was publicly announced in 2018. However, cardiologists were seeing a trend of atypical DCM cases for several years prior." Id.

- "Since the onset of the investigation, the FDA has received hundreds of case reports . . ." Id.

- "Since the onset of the investigation . . . seven independent studies have been conducted by researchers." Id.

- "The FDA, researchers, and individual clinicians and pet owners have all reported reversal of disease with a diet change." Id.

- "The FDA has identified a worrying correlation between grain-free diets and dilated cardiomyopathy." Id., ¶ 228.

- "We want to be extremely clear that the FDA advisory does not apply solely or exclusively to grain-free foods. It applies to any foods that are generally un(der)tested or un(der)studied as long-term dog diets. We sometimes talk about them as 'BEG' diets." Id.

- "In terms of exactly what's going on in exactly what pieces of the diet, nutritional DCM is one of those rare diseases where we have the cure before we know the precise details of the cause. We do not think you should wait to act until we know those specific details. There is no risk in switching to a proven and tested diet, and a definite risk in staying on a suspect diet." Id.

- "DCM is caused by boutique brands, exotic proteins, or grain-free or a combination thereof . . ." Id.

Before 2018 and the FDA investigation, defendant experienced little growth. In the following four years, however, defendant's revenues grew by more than 50 per cent to $3.3 billion per year. Meanwhile, plaintiff—a company which fits squarely in defendant's definition of a BEG dog food company—has lost business and market value as a result of defendant's misinformation: former customers stopped buying its products, veterinarians advised pet owners not to purchase its products and members of its target market chose not to do so.

On February 6, 2024, plaintiff filed suit, asserting claims for false advertising under the Lanham Act, 15 U.S.C. § 1051 et seq., and civil conspiracy under Kansas law. See id. Specifically, plaintiff, individually and on behalf of a class, alleges that (1) in violation of the Lanham Act, defendant—through its own conduct and that of its cut-outs (MMI and MAF) and the individual veterinarians—willfully represented that BEG diets are correlated, linked or otherwise associated with canine DCM; and (2) in violation of Kansas law, they conspired to falsely convince American dog owners that a diverse group of dog food products made by defendant's competitors increase the risk and severity of DCM. Plaintiff asserts that defendant is liable for its own false representations and vicariously liable for those of its co-conspirators and agents—MMI, MAF and the individual veterinarians. On June 17, 2024, defendant filed its motion

to dismiss.  See Motion To Dismiss (Doc. #82).

## Analysis

In relevant part, Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)(1), provides as follows:

(1)    Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which— * * *

(B)    in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1)(B).

Defendant argues that under Rules 9(b) and 12(b)(6), Fed. R. Civ. P., the Court should dismiss plaintiff's claims for false advertising and civil conspiracy.  Specifically, defendant asserts that the Court should dismiss plaintiff's false advertising claim because (1) the challenged statements were not in "commercial advertising or promotion" under 15 U.S.C. § 1125(a)(1)(B); (2) plaintiff does not plausibly allege a false or misleading statement of fact under 15 U.S.C. § 1125(a)(1) because plaintiff does not allege that DCM is not linked to certain diets; (3) plaintiff has not alleged false representations with particularity under Rule 9(b); (4) defendant is not vicariously liable for statements by MMI, MAF and the individual veterinarians; and (5) all but one of the alleged statements occurred between August 2019 and January 2022 and the doctrine of laches bars plaintiff's Lanham Act claim.  Defendant argues that the Court should dismiss plaintiff's civil conspiracy claim because (1) if plaintiff's Lanham Act claim fails, so too does plaintiff's civil conspiracy claim; (2) plaintiff did not plead this claim with the requisite

particularity under Rule 9(b); and (3) the Kansas statute of limitations bars this claim.

After reviewing plaintiff's 124-page complaint, the Court categorizes defendant's alleged misrepresentations regarding the correlation between DCM and BEG diets as follows: (1) statements by individual veterinarians in scholarly journals; (2) statements by individual veterinarians in blog posts; (3) statements by individual veterinarians to mainstream media during the FDA investigation; (4) statements by individual veterinarians to pet owners; (5) statements by defendant to veterinarians in its educational programs; (6) statements by defendant to members of its DCM Facebook page; and (7) statements by defendant and MAF on their respective web sites.

For purposes of its Lanham Act analysis, the Court assumes but does not hold that defendant is vicariously liable for statements by MMI, MAF and the individual veterinarians.

## I.     Whether Plaintiff States A Claim For False Advertising

Plaintiff asserts that defendant is liable for false advertising under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B). To state a claim for false advertising, plaintiff must plausibly allege that in connection with the "commercial advertising or promotion" of its product, defendant made a material "false or misleading representation of fact." Bimbo Bakeries USA, Inc. v. Sycamore, 29 F.4th 630, 643 (10th Cir. 2022); 15 U.S.C. § 1125(a)(1).

As noted, defendant argues that plaintiff's claim fails as a matter of law because (1) the challenged statements do not constitute "commercial advertising or promotion" and (2) plaintiff does not plausibly allege a "false or misleading representation of fact," i.e. that grain-based diets do not cause DCM. Plaintiff responds that (1) disparaging competitor goods constitutes commercial advertising or promotion of defendant's products; and (2) no evidence links BEG diets to canine DCM, so defendant's statements are necessarily false and misleading.

A.    Whether Plaintiff Alleges Commercial Advertising Or Promotion

To constitute commercial advertising or promotion under 15 U.S.C. § 1125(a)(1)(B), the statements must be (1) commercial speech; (2) by or on behalf of defendant who is in commercial competition with plaintiff; (3) for the purpose of influencing consumers to buy defendant's products; and (4) disseminated sufficiently to the relevant purchasing public to constitute "advertising" or "promotion" within the industry.  Proctor & Gamble Co. v. Haugen, 222 F.3d 1262, 1273–74 (10th Cir. 2000).

For the first element, commercial speech is "speech which does no more than propose a commercial transaction."  Bolger v. Youngs Drug Prod. Corp., 463 U.S. 60, 67 (1983) (internal quotations omitted).    Speech that "proposes a commercial transaction" "possesses certain hallmarks, including pertinent price and product information."  GeigTech E. Bay LLC v. Lutron Elecs. Co., No. 18 CIV. 5290 (CM), 2019 WL 1768965, at *10 (S.D.N.Y. Apr. 4, 2019).    In determining whether speech is commercial or noncommercial, the Court considers three factors: (1) whether the communication is an advertisement, (2) whether it references a specific product and (3) the economic motivation of the speaker.  Bolger, 463 U.S. at 66–67.  In applying this test, the Supreme Court has advised that a finding of just one factor does not make speech commercial, but "the combination of all these characteristics . . . provides strong support for the . . . conclusion that the [speech can be] properly characterized as commercial speech."  Id. at 67.

Courts have consistently concluded that scientific articles do not constitute commercial speech and therefore cannot be the basis for false advertising claims under the Lanham Act, even when a commercial entity has funded the research.[8]    See e.g., ONY, Inc. v. Cornerstone

---

[8]    To the extent that plaintiff asserts the scientific studies are premised on fraudulent data, the Court addresses falsity in the next section of this order.

Therapeutics, Inc., 720 F.3d 490, 498 (2d Cir. 2013) (study published in peer-reviewed scientific journal not false advertising under Lanham Act); Underwager v. Salter, 22 F.3d 730, 736 (7th Cir. 1994) ("Scientific controversies must be settled by the methods of science rather than by the methods of litigation."); Sanderson v. Culligan Int'l, 415 F.3d 620, 624 (7th Cir. 2005) (Lanham Act not "designed to throw into federal courts all disputes about the efficacy of competing products . . . and scientific disputes must be resolved by scientific means," not federal courts).  On the other hand, the secondary dissemination of scientific and academic research can constitute actionable commercial speech under the Lanham Act if defendant uses the material to promote its product and influence purchasers.  See e.g., Eastman Chem. Co. v. Plastipure, Inc., 775 F.3d 230, 236 (5th Cir. 2014) ("Advertisements do not become immune from Lanham Act scrutiny simply because their claims are open to scientific or public debate. Otherwise, the Lanham Act would hardly ever be enforceable."); Bracco Diagnostics, Inc. v. Amersham Health, Inc., 627 F. Supp. 2d 384, 459 (D.N.J. 2009) (secondary distribution constituted commercial speech when campaign used scientific article for product promotion).

While the Supreme Court has never articulated a bright-line test, it has rejected sweeping definitions of what constitutes commercial speech.  City of Cincinnati v. Discovery Network, Inc., 507 U.S. 410, 419 (1993) (commercial speech analysis fact-driven due to inherent difficulty of drawing bright-line rules).  Otherwise, any speech can become commercial if eventually relied on by third parties to purchase some good or service.  Exeltis USA Inc. v. First Databank, Inc., No. 17-CV-04810-HSG, 2017 WL 6539909, at *7 (N.D. Cal. Dec. 21, 2017).  For example, under a broad interpretation, a newspaper article could be considered "commercial speech" because the newspaper company sells newspapers, and a third party bases a decision on information in the newspaper.  See New York Times Co. v. Sullivan, 376 U.S. 254, 266 (1964) ("That the Times was

-18-

paid for publishing [an] advertisement is as immaterial in this connection as is the fact that newspapers and books are sold."). The mere compilation of information is not commercial speech. See Exeltis USA, 2017 WL 6539909, at *7.

Similarly, courts have concluded that web site links to other commercial sites, which are one step removed from defendant's own web site, do not render defendant's web site commercial speech. See Savannah Coll. of Art & Design, Inc. v. Houeix, 369 F. Supp. 2d 929, 945–46 (S.D. Ohio 2004). In Savannah College of Art & Design, defendant's web site contained links to "For foreign students seeking information on U.S. Colleges and Universities," "groups.yahoo/students forum," and "LiveJournal.com/Students forum." Id. at 944. The district court held that the links on defendant's web site were not inherently commercial because they were not offers to sell or distribute goods or services. Id. at 946. Further, the court observed that to arrive at the commercial content, a person had to take two steps away from defendant's web site and the connection was therefore "too tenuous" to make defendant's site commercial. Id.

Here, defendant argues that plaintiff has not alleged two required elements of commercial advertising or promotion under Proctor & Gamble: that (1) the statements are commercial speech and (2) the purpose of the statements was to influence consumers to purchase defendant's products. Defendant asserts that the alleged statements were not "commercial" because they (1) contained either clinical-based observations by veterinarian cardiologists and nutritionists or accurate reporting of the FDA investigation; (2) did not reference any specific product or company; and (3) were educational in nature.

Plaintiff responds that to stem the encroachment of smaller companies on defendant's market share, defendant repeatedly asserted a causal link between BEG diets and DCM. Plaintiff states that even though the statements raise an issue of public concern, defendant cannot use public

concern as a vehicle to make false commercial claims to discourage purchase of directly competing products.

Preliminarily, the Court sustains defendant's motion to dismiss statements in scholarly journals and statements on the respective web sites of defendant and MAF which link to articles, interviews and or/blog posts of the individual veterinarians. First, scientific publications are not commercial speech and cannot be the basis for a false advertising claim under the Lanham Act. See ONY, 720 F.3d at 498. Second, the web site links to external pet nutrition information do not constitute commercial speech because the commercial content contained in the linked sites—if any—is "two steps" removed from the web sites of defendant and MAF.[9] See Savannah Coll. of Art & Design, 369 F. Supp. 2d at 945–46.

In addition to the statements in scholarly journals, web site statements and links to external sources, plaintiff alleges false statements by veterinarians to mainstream media and pet owners and statements by defendant in educational programs for veterinarians and on Facebook and its web sites. Even taking plaintiff's allegations as true, plaintiff has failed to plausibly allege that these categories of statements constitute commercial speech, i.e. that the primary purpose was to propose a consumer transaction to purchase defendant's products. At best, plaintiff alleges that the statements influenced consumers to purchase products other than its own grain-free products— but not to specifically purchase defendant's products. See Strauss v. Angie's List, Inc., No. 17-CV-2560-HLT, 2018 WL 5722561, at *12 (D. Kan. Nov. 1, 2018) (statements that only influence consumers to not purchase *plaintiff's* products do not satisfy Proctor & Gamble test) (emphasis

_____

[9]    Plaintiff also alleges that one section of defendant's web site required an account creation and sign-in for veterinarians and veterinary technicians, and that this section contained further content attacking the safety of BEG diets. To the extent that plaintiff argues that content in the password-restricted section is commercial speech, the Court reaches the same conclusion that any connection is far too attenuated to be promotion to end consumers.

added), aff'd, 951 F.3d 1263 (10th Cir. 2020).

In determining whether speech is commercial or noncommercial, the Court focuses on the three factors articulated in Bolger: whether the communication is an advertisement, whether it references a specific product and the economic motivation of the speaker.

> 1.    Whether The Communications Were Advertisements

An "advertisement" is a "commercial solicitation; an item of published or transmitted matter made with the intention of attracting clients or customers." Black's Law Dictionary (11th ed. 2019). Advertising is "speech about a product or service by a person who is offering that product or service at a price, directed to persons who may want, and be willing to pay for, that product or service." PAX Water Techs., Inc. v. Medora Corp., No. 18-09143-JAK, 2019 WL 4390567, at *8 (C.D. Cal. Aug. 5, 2019) (quoting Kasky v. Nike, Inc., 27 Cal. 4th 939, 960–61 (2002)) (describing first Bolger factor). Traditionally, advertising for purposes of commercial speech are television commercials or notices in a publication for a product or sale. See Facenda v. N.F.L. Films, Inc., 542 F.3d 1007, 1017 (3d Cir. 2008). To be commercial speech, the misrepresentations need not be made in a "classic advertising campaign," but may consist of more informal types of promotion. Proctor & Gamble, 222 F.3d at 1273–74.

Whether a statement constitutes actionable advertising or promotion may depend on the extent to which the matter is distributed and the purpose of the statements. See Garland Co. Inc. v. Ecology Roof Sys. Corp., 895 F. Supp. 274 (D. Kan. 1995) (statement to single recipient not advertising or sufficient dissemination required for Lanham Act claim); In re SoClean, Inc., Mktg., Sales Pracs. & Prod. Liab. Litig., No. 2-MC-152, 2023 WL 8006602, at *32 (W.D. Pa. Nov. 17, 2023) (recall notice not advertisement where purpose to inform consumers about recall, not encourage purchase of products); Neurotron, Inc. v. Am. Ass'n of Electrodiagnostic Med., 189 F.

Supp. 2d 271, 277 (D. Md. 2001) (article not commercial speech where "only thing promoted by [defendant's] article is further study and publication of additional articles so that some conclusion can be drawn about the effectiveness of [plaintiff's product].""), aff'd, 48 F. App'x. 42 (4th Cir. 2002).  Even statements that might be part of a "smear campaign" targeted at plaintiff's products are not commercial speech if such a purpose is incidental to the primary purpose behind the statement.  In re SoClean, 2023 WL 8006602, at *32.

Plaintiff does not allege false statements in a specific advertisement or advertising campaign and in fact, none of the allegedly false statements expressly promote defendant's products relative to plaintiff's products or relative to the products of other grain-based pet food manufacturers.[10]  The first factor in Bolger largely focuses on whether the statements were for the purpose of attracting customers or promoting the sale of a product.  Plaintiff cites allegedly false statements in blog posts, media interviews, medical discussions between veterinarians and pet owners and educational courses.  Plaintiff does not allege that defendant sent promotional materials directly to consumers, encouraging them to purchase its product, or that product packaging contained the alleged misrepresentations.  Plaintiff alleges that defendant spoke directly to consumers through its private Facebook page (where consumers could become members) but asserts no factual allegations that those statements promoted the sale of defendant's products.

Plaintiff has not plausibly alleged that the statements in question proposed a transaction or offered certain goods or services, let alone for defendant's products.  The statements by individual veterinarians in blog posts, to mainstream media and to pet owners are too attenuated to deem them promotional in nature because plaintiff's allegations assume multiple levels of promotion

---

[10]    Plaintiff cites scores of allegedly false statements but does not associate any of them with advertising.

before reaching an end consumer.  Plaintiff has not alleged that statements by defendant to veterinarians in educational programs were anything but educational in nature, and the Court cannot reasonably infer that a continuing educational program on the safety of a pet food diet is an advertisement.

Under the Lanham Act, the statements must propose a transaction for defendant's products. See Strauss, 2018 WL 5722561, at *12.  While advertising in the most traditional sense of the word is not required (i.e. printed materials, television commercials and the like), plaintiff has not alleged facts from which the Court can reasonably infer that the primary purpose of the statements in question was to advertise defendant's products, rather than to advance an educational, clinical or informational agenda.  Even construing the term broadly, plaintiff has not alleged that the statements in question were advertisements.

2.    Whether The Statements Reference A Specific Product

Plaintiff does not allege that any category of the statements in question referenced specific pet-food manufacturers or companies, or contained pertinent price, product or sale information. While some of the alleged statements do disparage so-called "BEG diets," at least by implication, they never disparage a specific grain-free pet food or promote a specific traditional pet food.  The statements do not reference plaintiff's products, defendant's products or the products of other grain-based pet food manufacturers.  Again, at best, plaintiff alleges that the statements encourage consumers not to purchase plaintiff's products or those of other BEG pet food manufacturers but are silent on whether to purchase defendant's products or those of other grain-based manufacturers. Plaintiff does not allege that defendant's misrepresentations ever referenced specific products of plaintiff, defendant or other manufacturers in the pet food market.

3.      The Economic Motive Of The Speaker

Plaintiff has alleged an economic motive behind the statements, i.e. that when grain-free products gained popularity and defendant's market share fell by more than 20 per cent, defendant initiated this marketing scheme to question the safety of BEG products, so consumers would purchase its products. As the Supreme Court has noted, however, the presence of just one factor does not make speech commercial. See Bolger, 463 U.S. at 67.

Plaintiff has failed to plausibly allege that defendant, MAF, MMI and the individual veterinarians made the allegedly false statements (1) in advertisements that referenced specific products or (2) for the purpose of influencing consumers to purchase defendant's products. Accordingly, even taking plaintiff's allegations as true, the Court cannot reasonably infer that the statements propose a consumer transaction to purchase defendant's products. Plaintiff has therefore failed to allege this element of a false advertising claim.

B.      Whether Plaintiff Alleges Materially False And Misleading Information

Defendant argues that plaintiff has failed to plausibly allege materially "false or misleading representations of fact," i.e. that BEG diets are not linked to DCM. Plaintiff responds that no evidence links BEG diets to an increased risk of DCM, so any statements to the contrary are necessarily false.

The Lanham Act prohibits two types of representations: those that (1) are literally false, either on their face or by necessary implication, and (2) are literally true but likely to mislead and confuse consumers. See Intermountain Stroke Ctr., Inc. v. Intermountain Health Care, Inc., 638 F. App'x 778, 785 (10th Cir. 2016). To form the basis of a false advertising claim, the representations must be statements of fact; statements of opinion or mere "puffery" are incognizable claims. Id. If a statement is ambiguous—that is, susceptible to more than one

-24-

reasonable interpretation—it cannot be literally false.  I Dig Texas, LLC v. Creager, 98 F.4th 998,

1010 (10th Cir. 2024); see also Bimbo Bakeries USA, Inc. v. Sycamore, 29 F.4th 630, 644–47

(10th Cir. 2022) (representation actionable only if objectively capable of being determined true or

false).  Stated differently, only unambiguous statements can be literally false.  I Dig Texas, 98

F.4th at 1010.  Similarly, claims that are "implicit, attenuated, or merely suggestive cannot fairly

be characterized as literally false."  Zoller Lab'ys, LLC. v. NBTY, Inc., 111 F. App'x 978, 983

(10th Cir. 2004) (quoting United Indus. Corp. v. Clorox Co., 140 F.3d 1175, 1181 (8th Cir.

1998)).[11]

As noted, defendant argues that (1) plaintiff does not allege literal falsity because it has not

alleged that DCM is not causally linked to BEG diets; and (2) plaintiff only makes conclusory

assertions that defendant's statements are "false" and "bogus," so it has failed to plead material

falsity with particularity under Rule 9(b).

1.     Literal Falsity

Plaintiff alleges that defendant continuously represented to veterinarians and the public

that BEG diets increase the risk of canine DCM.[12]  Plaintiff alleges that the statements in question

were false because BEG diets do not increase the risk of canine DCM.  In other words, plaintiff

---

[11]     When plaintiff's theory of falsity is premised on an implied falsehood—where the representations are true but likely to misled and confuse consumers—plaintiff must allege actual consumer deception.  Vincent v. Utah Plastic Surgery Soc., 621 F. App'x 546, 550 (10th Cir. 2015).  Plaintiff does this by alleging evidence of "a statistically significant part of the commercial audience holds the false belief allegedly communicated by the challenged advertisement."  Id. (quoting Johnson & Johnson * Merck Consumer Pharms. Co., v. Smithkline Beecham Corp., 960 F.2d 294, 297–98 (2d Cir. 1992)).  Here, plaintiff does not rely on a theory of implied falsehood or allege facts which plausibly suggest consumer deception based on true representations.

[12]     Although plaintiff cites scores of allegedly false and misleading statements, very few of them actually address whether BEG diets increase the risk of canine DCM.  In this respect, plaintiff's arguments seem to outrun the factual allegations of the complaint.

relies of a theory of literal falsity.

Plaintiff specifically alleges that no current peer-reviewed studies show that (1) dogs on BEG diets have a higher risk of developing DCM; (2) switching a dog from a BEG diet to a non-BEG diet is likely to improve DCM; or (3) BEG diets are correlated with worse clinical outcomes for dogs. Plaintiff alleges that after investigating reported cases for more than four years, the FDA does not have sufficient data to establish a causal relationship between BEG diets and DCM.[13] Plaintiff argues that because FDA data does not affirmatively establish a causal relationship, no causal relationship exists and it has sufficiently alleged falsity.

Plaintiff asks the Court to evaluate its allegations of falsity under a lenient standard that other circuits have created for commercial claims based on scientific evidence. See e.g., Rhone-Poulenc Rorer Pharms., Inc. v. Marion Merrell Dow, Inc., 93 F.3d 511, 514–15 (8th Cir. 1996). Under this standard, when an advertisement cites test or survey results, plaintiff need only show "that the tests referred to were not sufficiently reliable to permit one to conclude with reasonable certainty that they established the proposition for which they were cited." Id. (quoting Castrol v. Quaker State Corp., 977 F.2d 57, 62–63 (2d Cir. 1992)). Therefore, plaintiff challenging "tests prove" or "establish" claims does not need to affirmatively prove that defendant's assertions are false, but only that the studies do not support the conclusions. Osmose, Inc. v. Viance, LLC, 612 F.3d 1298, 1310 (11th Cir. 2010). Under this approach, plaintiff may survive a motion to dismiss—and state a claim for literal falsity—by alleging that "the margin of error was too high, the sample size was insufficient, the participants were not sufficiently screened, the questions and

---

[13]    Plaintiff has alleged that the articles and studies suffer from various scientific infirmities, including (1) methodological irregularities, (2) sample sizes so small as to render them useless as valid sources of inferences, (3) data manipulation and (4) concealment of financial conflicts of interest. Plaintiff alleges that in addition to unreliable data, the empirical evidence itself fails to establish with reasonable certainty that BEG diets increase the risk of DCM.

responses were too narrow, and the structure, execution, and methodology were flawed." Fed. Exp. Corp. v. United Parcel Serv., Inc., 765 F. Supp. 2d 1011, 1020 (W.D. Tenn. 2010). The Tenth Circuit has neither adopted nor rejected this standard for Lanham Act claims which rely on scientific test results.

Defendant argues that the Court should not apply the more lenient standard because the challenged statements were not advertising and defendant never claimed that studies "prove" a link between DCM and BEG diets. The Court agrees. Again, courts apply the more lenient test when an advertisement cites test or survey results, but plaintiff has not alleged that defendant or the veterinarians made such statements in advertisements. See supra Section I.A. Moreover, plaintiff does not plead facts which plausibly establish falsity, i.e. that defendant made representations that were false or misleading by representing that BEG diets increase the risk of canine DCM.[14] Even taking plaintiff's point that current science may not affirmatively establish causation, the Court cannot plausibly infer that BEG diets *do not* cause DCM.

At this stage, the Court's role is to assume as true all well-pleaded factual allegations. Iqbal, 556 U.S. at 679. Plaintiff has alleged that not a single peer-reviewed journal or the FDA discovered a link between the DCM and BEG diets, and that these factual allegations are consistent with its theory that BEG diets do not cause DCM. In other words, plaintiff has alleged a possibility that if defendant has stated that "BEG diets increase the risk of canine DCM," defendant's statements are literally false. Under Iqbal, however, plaintiff must allege facts which permit the Court to infer more than the mere possibility of falsity. In the final analysis, plaintiff reasons that

---

[14]    Preferably, the parties would have examined each of the allegedly false representations to determine whether plaintiff has sufficiently alleged literal falsity. Because they have not done so, the Court reluctantly addresses that question based on a collective view of the allegedly false statements.

defendant's statements must be false because it and the FDA have not proven them true.  Plaintiff's theory of falsity is premised on a logical fallacy: that BEG diets do not cause DCM because it has not been proven true that they do cause DCM.  Plaintiff may be correct that BEG diets do not increase the risk of canine DCM, but under <u>Iqbal</u> and <u>Twombly</u>, the Court cannot allow plaintiff's claim to go forward on the basis of such reasoning.  The Court therefore sustains defendant's motion to dismiss on this element of plaintiff's false advertising claim.

### 2.     Failure To Plead With Particularity

Rule 9(b), Fed. R. Civ. P., requires that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."  The purpose of Rule 9(b)'s heightened standard is to enable a defending party to prepare an effective response to charges of fraud and to protect the party from unfounded charges of wrongdoing which might injure its reputation and goodwill.  <u>Swimwear Sol., Inc. v. Orlando Bathing Suit, LLC</u>, 309 F. Supp. 3d 1022, 1045 (D. Kan. 2018).  To survive a motion to dismiss, plaintiff must describe the circumstances of the fraud, <u>i.e.</u> the time, place and content of the false representation; the identity of the person making the representation; and the harm caused by plaintiff's reliance on the false representation.  <u>Kestrel Holdings I, LLC v. Learjet Inc.</u>, 316 F. Supp. 2d 1071, 1078 (D. Kan. 2004).

Federal district courts are split on whether Rule 9(b) applies to allegations of falsity under the Lanham Act.  <u>Compare</u> <u>Vertical Web Media, L.L.C. v. Etailinsights, Inc.</u>, No. 14 C 3220, 2014 WL 2868789, at *3 (N.D. Ill. June 24, 2014) (heightened pleading standard for false advertising claims under Lanham Act) <u>with</u> <u>U.S. ex rel. Knisely v. Cintas Corp.</u>, 298 F.R.D. 229, 239 (E.D. Pa. 2014) (Lanham Act requires only that plaintiff plead sufficient facts to support allegations).  To the extent that plaintiff alleges intentional or knowing misrepresentations, district courts in this

circuit have applied Rule 9(b) to claims of falsity under the Lanham Act.  See Brave L. Firm, LLC v. Truck Accident Laws. Grp., Inc., No. 17-1156-EFM, 2019 WL 2073872, at *5 (D. Kan. May 10, 2019); Goode v. Gaia, Inc., No. 20-CV-00742-KAS, 2023 WL 7190732, at *10 (D. Colo. Nov. 1, 2023); Integrated Bus. Techs., LLC v. Netlink Sols., LLC, No. 16-CV-048-TCK, 2016 WL 4742306, at *4 (N.D. Okla. Sept. 12, 2016).

Defendant argues that plaintiff did not plead with particularity that its representations were false or misleading.  Specifically, defendant argues that to describe the statements, plaintiff uses conclusory language, such as "false," "bogus" or stemming from "no valid scientific evidence." Defendant contends that under Rule 9(b), plaintiff's allegations are insufficient to state a claim for false advertising under the Lanham Act.  The Court need not address this issue because for reasons previously stated, even under standard notice pleading standards, plaintiff has not stated a viable claim under the Lanham Act.

C.    Whether The Doctrine Of Laches Bars Plaintiff's False Advertising Claim

Defendant argues that even if plaintiff stated a claim for false advertising under the Lanham Act, the doctrine of laches bars plaintiff's claim.

The Lanham Act does not contain a statute of limitations, but "expressly provides for defensive use of 'equitable principles, including laches.'"  Petrella v. Metro-Goldwin-Mayer, Inc., 572 U.S. 663, 678 n.15 (2014) (quoting 15 U.S.C. § 1115(b)(9)).  The doctrine of laches is an equitable defense designed to bar stale claims.  United Cities Gas Co. v. Brock Expl. Co., 995 F. Supp. 1284, 1298 (D. Kan. 1998).  Laches is defined as "the neglect or omission to assert a right that, taken in conjunction with lapse of time and other circumstances, causes prejudice to an adverse party."  State ex rel. Stovall v. Meneley, 271 Kan. 355, 389, 22 P.3d 124, 149 (2001). While courts may look unfavorably on claims asserted after a lengthy passage of time, "[d]elay,

by itself . . . does not constitute laches and an action generally will not be defeated by laches alone unless some prejudice has resulted therefrom to the rights or interests of the adverse party." Cosgrove v. Young, 230 Kan. 705, 719, 642 P.2d 75, 86 (1982) (quoting Darby v. Keeran, 211 Kan. 133, 505 P.2d 710, Syl. ¶ 10 (1973)).

To determine whether the defense bars plaintiff's claim, courts consider the totality of the circumstances surrounding the filing of the lawsuit. Everest Indem. Ins. Co. v. Jake's Fireworks, Inc., 501 F. Supp. 3d 1158, 1990 (D. Kan. 2020). Courts commonly use the applicable state statute of limitations as a guideline to determine whether the doctrine of laches bars a claim under the Lanham Act. See Yeager v. Fort Knox Security Prods., 602 F. App'x 423, 431 (10th Cir. 2015). Under Kansas law, the most analogous claim is fraud, which must be filed within two years of when "the act giving rise to the cause of action first causes substantial injury," or when "the fact of injury becomes reasonably ascertainable to the injured party." Strauss, 2018 WL 5722561, at *7 (analogous Kansas claim is fraud); K.S.A. § 60-513(b).

Defendant argues that the allegations in the complaint fall outside the two-year statute of limitations period and therefore are time-barred under the doctrine of laches. Defendant asserts that the only statement within the limitations period is a presentation that defendant made to veterinarians and published on its web site in November of 2023. In addition, defendant argues that (1) plaintiff's delay in filing suit was unreasonable because it was constructively aware of the alleged misrepresentations and (2) by not filing suit, plaintiff allowed its damage claim (defendant's profits) to rise to a ten-figure amount, prejudicing defendant.

Plaintiff argues that the doctrine of laches does not bar its claim because any delay in filing suit was reasonable, and defendant has not been prejudiced by any such delay. Plaintiff specifically argues that it filed suit within a year of the FDA announcing that it had insufficient

data to establish a causal relationship between BEG diets and DCM. Plaintiff asserts that it was reasonable to wait until the FDA announced its conclusions, so plaintiff knew with confidence that no evidence of a correlation existed. Moreover, plaintiff contends that defendant did not suffer any prejudice. Plaintiff alleges that defendant made billions of dollars on these false statements during the relevant period, and that defendant did not make costly expenditures in reliance on the purported delay.

Reviewing the totality of the circumstances surrounding when plaintiff filed suit, and taking as true the relevant allegations in the complaint, plaintiff has alleged that its delay was reasonable, and that defendant did not suffer undue prejudice. Delay by itself is not dispositive, and although some of the alleged misrepresentations fall outside the statute of limitations period, the statute of limitations is only a guideline which the Court can consider. Plaintiff has alleged circumstances which facially justify the timing of this suit. Accordingly, the Court overrules defendant's motion to dismiss based on the doctrine of laches.

## II.    Whether Plaintiff States A Claim For Civil Conspiracy

Plaintiff asserts a claim for civil conspiracy under Kansas law. To state a claim for civil conspiracy, plaintiff must allege "(1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds in the object or course of action; (4) one or more unlawful overt acts; and (5) damages as the proximate result thereof." State ex rel. Mays v. Ridenhour, 248 Kan. 919, 927, 811 P.2d 1220, 1226 (1991). A claim for civil conspiracy is not actionable without an underlying wrong which gives rise to a tortious cause of action. Id. at 930.

Defendant argues that the Court should dismiss plaintiff's claim for civil conspiracy because (1) a claim for false advertising under the Lanham Act cannot form the basis of a civil conspiracy claim; (2) even if it could, plaintiff's claim for false advertising fails as a matter of law

and therefore the civil conspiracy claim also fails; (3) plaintiff has not alleged civil conspiracy with the particularity required by Rule 9(b); and (4) the statute of limitations bars plaintiff's claim.

Whether a Lanham Act claim can serve as the underlying wrong for a civil conspiracy claim is an undecided question in this circuit. See Brave L. Firm, LLC, 2018 WL 3122172, at *8 n.63 (leaving question open because court already dismissed Lanham Act claim). The Kansas Supreme Court has noted that a violation of a Kansas statute could support a cause of action for civil conspiracy, but it has not addressed whether a violation of a federal statute can form the basis of the claim. See Stoldt v. City of Toronto, 234 Kan. 957, 967, 678 P.2d 153, 161 (1984). Courts in this district have reached differing conclusions regarding civil conspiracy claims based on violations of federal statutes. Compare White v. Graceland Coll. Ctr. for Pro. Dev. & Lifelong Learning, Inc., No. 07-2319-CM, 2008 WL 4148602, at *3 (D. Kan. Sept. 4, 2008) (violation of Family Medical Leave Act not actionable underlying tort for civil conspiracy claim) with Heartland Surgical Specialty Hosp., LLC v. Midwest Div., Inc., 527 F. Supp. 2d 1257, 1325 (D. Kan. 2007) (civil conspiracy claim survived summary judgment based on Sherman Act claim).

The Court need not answer this undecided question of law. As in Brave L. Firm LLC, the Court dismisses plaintiff's Lanham Act claim and for purposes of its civil conspiracy claim, plaintiff has no other underlying wrong. The Court therefore sustains defendant's motion to dismiss this claim.

**IT IS THEREFORE ORDERED** that Defendant Hill's Pet Nutrition, Inc.'s Motion To Dismiss Complaint (Doc. #82) filed June 17, 2024 is **SUSTAINED.**

Dated this 5th day of November, 2024 at Kansas City, Kansas.

s/ Kathryn H. Vratil
KATHRYN H. VRATIL
United States District Judge